IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

GILBERTO RUIZ a/k/a        )
JESUS BARRIGA a/k/a       )
JOSE SANCHEZ a/k/a        )
GILBERTO LOPEZ,            )
                           )
      Plaintiff,       )
                           )
vs.                     )      No. 09-2042-STA-cgc
                           )
S. DAVIS, et al.,       )
                           )
      Defendants.      )
                           )

---

ORDER CORRECTING THE DOCKET
ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND
ORDER OF PARTIAL DISMISSAL

---

On February 2, 2009, Plaintiff Gilberto Ruiz a/k/a Jesus Barriga a/k/a Jose Sanchez a/k/a Gilberto Lopez, RNI number 297555, who is currently an inmate at the Shelby County Correction Center in Memphis, Tennessee, filed a <u>pro</u> <u>se</u> complaint pursuant to 42 U.S.C. § 1983 concerning his confinement at the Shelby County Criminal Justice Complex ("Jail") in Memphis. (Docket Entry ("D.E.") 1.) The defendants are Officers S. Davis, C. Atkins, R. Thomas, M. Stevenson, S. Brown, and A. Johnson. (<u>Id.</u>) The Court issued an order on August 31, 2009, that, <u>inter</u> <u>alia</u>, dismissed claims concerning a refusal to allow Plaintiff to use the telephone and inadequate medical treatment by an individual who is not a

party, and directed the Clerk to issue process for, and the marshal to effect service on, the defendants. (D.E. 9.)

On November 20, 2009, Defendants filed a motion to dismiss the complaint or, in the alternative, for summary judgment. (D.E. 24.)[1] Because Plaintiff did not respond to the motion, the Court issued an order on April 16, 2010, directing Plaintiff to show cause, within thirty (30) days, why Defendants' motion should not be granted. (D.E. 27.) On May 14, 2010, Plaintiff filed a factual affidavit. (D.E. 28.)

The Court has been invited to consider matters outside the pleadings and, therefore, will treat Defendants' motion as one for summary judgment. Summary judgment is appropriate "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As the Supreme Court has explained:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law"

---

[1]    Defendants' motion was accompanied by a notice that a DVD of the incident at issue had been filed. (D.E. 25.) Because the Clerk was unable to locate the DVD, the Court issued an order on August 19, 2010, directing Defendants to file the DVD and instructing the Clerk that the DVD should be filed under seal. (D.E. 29.) On August 19, 2010, Defendants notified the Court that a new copy of the DVD had been submitted, and Clerk's office staff located the copy that had previously been submitted. The docket does not reflect that any copy of the DVD has been received. The Clerk is directed to correct the docket to reflect receipt of the DVD and that it has been filed under seal.

> because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (citation omitted).

Under Fed. R. Civ. P. 56(e)(2), "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." In considering a motion for summary judgment, "the evidence as well as the inferences drawn therefrom must be read in the light most favorable to the party opposing the motion." Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (same).[2]

A genuine issue of material fact exists "if the evidence [presented by the non-moving party] is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also id. at 252 ("The mere existence of a scintilla of evidence in support of the

---

[2]    Rule 56(e)(1) sets forth in detail the evidentiary requirements applicable to a summary judgment motion:

A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict[.]"); Matsushita, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (footnote omitted). The Court's function is not to weigh the evidence, judge credibility, or in any way determine the truth of the matter, however. Liberty Lobby, 477 U.S. at 249. Rather, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

Fed. R. Civ. P. 56(f) provides as follows:

If a party when opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) deny the motion;

(2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or

(3) issue any other just order.

"Beyond the procedural requirement of filing an affidavit, Rule 56(f) has been interpreted as requiring that a party making such a filing indicate to the district court its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information." Cacevic v. City of Hazel Park, 226

4

F.3d 483, 488 (6th Cir. 2000); see also Good v. Ohio Edison Co.,
149 F.3d 413, 422 (6th Cir. 1998); Plott v. General Motors Corp.,
71 F.3d 1190, 1196-97 (6th Cir. 1995). The Sixth Circuit has held
that, unless the nonmoving party files a Rule 56(f) affidavit, a
district court cannot decline to consider the merits of a summary
judgment motion on the ground that it is premature. Wallin v.
Norman, 317 F.3d 558, 564 (6th Cir. 2003). In this case, Plaintiff
did not submit a Rule 56(f) affidavit and did not argue that he
needs discovery to respond to the motion. Therefore, the Court will
address the merits of the motion.

This case involves a claim of excessive force.
Plaintiff's complaint, which is sworn to under penalty of perjury,
states as follows:

> On 12-28-08, while in the recreation cage in 1.C. pod
> between Hour's [sic] of 13:30 and 14:30 I Gilberto Ruiz
> request to use the phone, but officer C. Atkins told me
> you is not goin [sic] to use it today[.] I told officer
> C. Atkins that I need to talk to my family. I ask to see
> the sgt Homes or Lt Richmon[. T]hey came and I told them
> that is in the book that I suppost [sic] to use it every
> date so they denied me too. So the D.R.T[.] team came and
> spray me and officer S. Davis punch me in the face and I
> fall to the floor[. W]hile on the floor officer C. Atkins
> star [sic] punching me in my face neck the other D.R.T[.]
> officers where [sic] kicking me all over my body and S.
> Davis choked me till I past [sic] out, and then and [sic]
> I wake up and then officer's [sic] pick me up from the
> ground and we walk to the elevator. While on the elevator
> officer C. Atkis [sic] told me to get on my knees so I
> did[. O]fficer C. Atkins got in front of me and kick me
> right in my mouth and then another D.R.T[.] officer knee
> struck me in my back of the head. [W]hile I was on the
> ground they kick me so bad[. T]hat I cry for mercy to
> please "stop" and then officer S. Davis grave [sic] me
> and choked me. I beg hem [sic] for my son to please stop
> and then I got kick in the back of my head and I git
> [sic] the steel ground with my left eye and then I past
> out. [T]he elevator door open and I said tank [sic] you

"Lord". [T]hey pick me up but they put same [sic] kind of mask in my face, and then we got to the nurse station and Nurse Pittman came to check me out. [B]ut she only ask me for my name and bookin [sic] # number[.] I gave her what she ask, and then Nurse Pittman ask S. Davis the leader of the team, and I jump in the conversation and I stated to Nurse Pittman to see what they did and she need to write it down and she just look at me and smile and left the room, and I waited like "5" minutes and then the officers told me to get up[.] [W]hile I was walkin [sic] to the door I saw her and told Nurse Pittman are you goin [sic] to fix me and then she just smile at me and walk out.

I got wrote up for this incident but I went to Disciplinary and my write up got dismissed from Sgt. [T]ownsend ID # 02168. Date 1/6/2009 at 13.03 hour's [sic] Inciden [sic] Number # 000442795. I found out to be not guilty for this charge[.]

(D.E. 1 at 2-4.)

Defendant Davis submitted an affidavit that stated, in pertinent part, as follows:

8.   On December 28, 2008, the DRT was contacted to assist with the Plaintiff. The event was videotaped by a member and I have reviewed it. A true and correct copy of the video that was made is marked as Exhibit B to my Affidavit. Officer Johnson operated the camera.

9.   The DRT team was notified that the Plaintiff refused an order to leave the screened recreational area, also referred to as an exercise cage, to return to his cell and lock down. The Plaintiff was housed in a disciplinary unit at the time.

10.   Officer Johnson accompanied me to the Plaintiff and I advised him that he needed to return to his cell. The Plaintiff refused to return to his cell and a supervisor was notified.

11.   A decision was made to have the DRT team remove the Plaintiff from the recreation area to return to his cell. At that point, the Plaintiff had urinated into a plastic cup and was kicking on the cage door.

12.   The DRT on duty at the time was assembled and I outlined the situation to them and had the team members

identify themselves and their duties. The time on the video reveals the following:

A. 02:29: the DRT approached the recreational area. The Plaintiff had placed a red shirt over his nose and mouth to avoid the effects of a chemical agent. The Plaintiff was sprayed.

B. 02:45, he threw the urine on the officers, including the camera operator. The DRT members are heard coughing throughout from the effects of the chemical spray throughout the incident. The spray did not appear to have any effect on the Plaintiff.

The Plaintiff had kicked the door to the exercise cage and jammed the lock. The Officers were not able to gain entry into the cage for about two (2) minutes.

C. 04:40, Officer Atkins used his shield to push the Plaintiff to the floor while other Officers performed their assigned duties, including removing the shield and securing the Plaintiff's extremities while he continued to struggle. Pressure point techniques were applied but no one struck or kicked the Plaintiff. The Plaintiff never lost consciousness. The Plaintiff was using a plastic "spork" as a defensive weapon during the struggle.

Other inmates began calling out and banging and kicking in their cells during that time.

D. 07:24, the Plaintiff was secured in handcuffs leg restraints, and a spit mask was placed over his head. He was then brought to his feet and escorted by the team out of the pod. There was blood on the spit mask by his mouth and it appeared that there was smeared blood on his white shirt.

E. 08:00, he was placed in an elevator with the DRT team. He was placed on his knees as a security precaution, pursuant to policy.

F. 08:35, he was told repeatedly to stop resisting and stay still during the elevator ride. At no time was he struck or kicked. He never lost consciousness.

G. 09:00, we arrived at the medical floor and the Plaintiff was still being told to stop resisting.

H.   09:58, the Plaintiff was in a medical examining room. He was fully conscious and there was more blood on the spit mask around his mouth and blood on his shirt.

I.   12:27, a nurse entered the examining room and obtained information.

J.   13:57, the Plaintiff advised the nurse that he had bitten his tongue.

K.   The Plaintiff threatened me numerous times while in the examining room.

L.   17:20, the Plaintiff was escorted back to his cell.

M.   18:25, the Plaintiff entered the elevator and was again placed on his knees pursuant to policy.

N.   18:59, the elevator stopped and the Plaintiff was escorted out.

O.   19:31, the Plaintiff was back in his pod and other inmates began yelling and banging their cells.

P.   19:39, DRT members entered the Plaintiff's cell to search it.

Q.   21:00, the light went out in the Plaintiff's cell. An inmate in the next cell had broken a table, used the leg to break a window, and gained access to the electrical wire.

R.   21:41, the Plaintiff was returned to his cell and his restraints were removed.

S.   23:15, the DRT was leaving the pod.

T.   Shortly thereafter, the DRT reassembled to extract the inmate in the cell next to the Plaintiff. That video begins at 23:55 but the entire incident is not contained on Ex. A.

13.   An incident report was prepared after the Plaintiff was extracted but it failed to mention that the Plaintiff threw urine on the DRT members. As a result, the disciplinary charge against the Plaintiff involving "spit/urine/feces/food/staff" was dismissed for failure to describe the Plaintiff's actions.

14. I did not strike, punch, choke, or kick the Plaintiff.

15. I did not observe any DRT member of his team strike, punch, choke or kick the Plaintiff.

16. I did not violate the Plaintiff's rights or using [sic] any force beyond that which was reasonably necessary to gain control of the Plaintiff.

17. I did not intentionally harm the Plaintiff.

(Affidavit of S. Davis, sworn to on Nov. 19, 2009 ("Davis Aff."), ¶¶ 8-17 (D.E. 24-1).)

Defendant Atkins submitted an affidavit that stated, in pertinent part, as follows:

5. On December 28, 2008, I was a member of the DRT that was called to assist with the Plaintiff. . . .

. . . .

8. On December 28, 2008, the DRT was contacted to assist with the Plaintiff. The event was videotaped by Officer Johnson and I have reviewed it.

The Plaintiff had reviewed an order to leave the screened recreational area, also referred to as an exercise cage, to return to his cell and lock down. The Plaintiff was housed in a disciplinary unit at the time.

Team leader Davis went to the Plaintiff and advised him that he needed to return to his cell. The Plaintiff refused to return to his cell and a supervisor was notified.

9. A decision as made to have the DRT team remove the Plaintiff from the cage. At that point, the Plaintiff had urinated into a plastic cup and was kicking on the cage door.

10. The DRT on duty at the time was assembled and Officer Davis outlined the situation to us. The team members identified themselves and their duties. My assigned duties called for me to use the shield to push the Plaintiff to the floor of the exercise cage and gain control of his head while other members performed their assigned duties. Once I no longer needed the shield,

another member removed it from the cell. The Plaintiff used a "spork" as a defensive weapon.

11.  I did not strike, punch, choke, or kick the Plaintiff.

12.  I did not observe any DRT member of his team strike, punch, choke or kick the Plaintiff.

13.  The Plaintiff never lost consciousness.

14.  I did not violate the Plaintiff's rights or using [sic] any force beyond that which was reasonably necessary to gain control of the Plaintiff.

15.  I did not intentionally harm the Plaintiff.

(Affidavit of C. Atkins, sworn to on Nov. 20, 2009 ("Atkins Aff."),

¶¶ 5, 8-15 (D.E. 24-2).)

Defendant Thomas filed an affidavit that stated, in pertinent part, as follows:

5.  On December 28, 2008, I was a member of the DRT that was called to assist with the Plaintiff. . . .

. . . .

10.  The DRT on duty at the time was assembled and Officer Davis outlined the situation to us. The team members identified themselves and their duties. My assigned duties called for me to be responsible for the Plaintiff's upper extremities and I was responsible for handcuffing the Plaintiff. The Plaintiff used a "spork" as a defensive weapon.

11.  I did not strike, punch, choke, or kick the Plaintiff.

12.  I did not observe any DRT member of his team strike, punch, choke or kick the Plaintiff.

13.  The Plaintiff never lost consciousness.

14.  I did not violate the Plaintiff's rights or using [sic] any force beyond that which was reasonably necessary to gain control of the Plaintiff.

15.  I did not intentionally harm the Plaintiff.

(Affidavit of R. Thomas, sworn to on Nov. 20, 2009 ("Thomas Aff."),
¶¶ 5, 10-15 (D.E. 24-3).) Similar affidavits were filed by
Defendant Stevenson, who was responsible for Plaintiff's "lower
extremities and . . . for placing the Plaintiff's legs in
restraints" (Affidavit of M. Stevenson, sworn to on Nov. 20, 2009
("Stevenson Aff."), ¶ 10 (D.E. 24-4)), and Defendant Brown, who was
responsible for "the use [of] the restraint chair if necessary and
to provide security during the incident" (Affidavit of S. Brown,
sworn to on Nov. 20, 2009 ("Brown Aff."), ¶ 10 (D.E. 24-5)).[3]

　　　　Defendant Johnson submitted an affidavit that stated, in
pertinent part, as follows:

> 　　8.　　On December 28, 2008, the DRT was contacted to
> assist with the Plaintiff. I was assigned to video the
> event. I have reviewed the video, Ex. A. to Officer
> Davis' Affidavit, and I was the videographer during the
> events involving the Plaintiff, including Officer Davis'
> visit to the Plaintiff to ask him to leave the screened
> recreational area, also referred to as an exercise cage,
> to return to his cell and lock down. The Plaintiff
> refused.
>
> 　　9.　　The team assembled to move the Plaintiff. When
> we arrived, the Plaintiff threw a cup of urine at us.
> Urine got on the camera lens, which I tried to remove.
> Urine also got in my helmet and ended up on my face and
> in my hair, which at times made it difficult for me to
> follow the Plaintiff's movements. I tried to video the
> entire event without interfering with other team members
> who were trying to secure and control the Plaintiff.
>
> 　　10.　　I did not strike, punch, choke, or kick the
> Plaintiff. I had no physical contact with the Plaintiff.
>
> 　　11.　　I did not observe any DRT member of his team
> strike, punch, choke or kick the Plaintiff.

---

[3]　　Defendant Brown stated that "[t]he restraint chair was not needed."
(Id.)

11

12.   The Plaintiff never lost consciousness.

13.   I did not violate the Plaintiff's rights or use any force beyond that which was reasonably necessary to gain control of the Plaintiff.

(Affidavit of A. Johnson, sworn to on Nov. 20, 2009 ("Johnson Aff."), ¶¶ 8-13 (D.E. 24-6))

In response to the show cause order, Plaintiff submitted another affidavit that differed, in some material respects, from the facts as recounted in the verified complaint:

> I have a DVD under seal, that DVD is, Exhibit Ex. 1(A)[.[4]] In this DVD shows how the officers. Davis, Atkins Thomas Stevenson, Brown, Johnson, where [sic] using excess for[sic] force while I Gilberto Ruiz, was being denied of all my privileges while I was in recreation cage. I told Officer Atkins that my name was wrote in the green handbook by Chief Moore, that I need to use the telephone everytime [sic] I get recreation time for 15 minutes) [sic] but I was denied, so I ask to speck [sic] to Lt or sgt and I was dinied [sic] Also so I refuse to lock down in till I see Lt or sgt but instead the DRT team came and told me to go back in my cell and I told them officers that I been denied for 3 days to use the phone so they wrote me up, and sprayed me with they mase [sic] and I put my red shirt in my face I had a cup with juice from lunch and I told officer Davis if he mase [sic] me again I am going to throw this at you have I haven [sic] done nothing wrong for you all spray me with the mase [sic] so they mase [sic] me again, they had problems opening the recreation door and Blame me saying that I jam the door by kickined [sic] but I never did kick the door so they rush in and put me in the ground while officers where [sic] putting handcuffs and leg restraints while officer Atkins struck me with he's [sic] knee in the neck several times and officer Davis was grabbing my throat chocking [sic] I was losing consciousness, officer Davis told me to stop resisting but I couldn't because I thought he was going to choke me in till I die. [S]o officer Davis stop and told the other officers to pick me up and scord [sic] me to the elevator while I was in the elevator officer Davis told officer Johnson she was operating the camara [sic] to put the

---

[4]   Plaintiff is apparently referring to the DVD submitted by Defendants in support of their motion.

> camara [sic] on Stevenson back, so they can beat me up
> while they had me in my knee's [sic] officer Atkins truck
> me, with hes [sic] fist several time's [sic] in my face
> and other officers where [sic] ckicking [sic] and
> ckicking [sic] all over my body and officer Davis chokke
> [sic] me til I lost consiousness [sic] I lost
> consiousness [sic] for like "5 or 10" minutes when I wake
> up from losing consiousness [sic] officer Davis was still
> holding my throat and I beg them for mercy to please stop
> but the [sic] refuse too, so the door open from the
> elevator and I was scorted [sic] me Medical Station to
> see Nurse Goodman and sit there waithing [sic] for
> medical attention but I stated to Nurse Goodman that I
> think I beat [sic] my tough [sic] because officers
> brutality [sic] beat me up and Nurse Goodman flash a
> smile to me and left the room I never get medical
> attetion [sic] so I got escorted back to my cell officer
> whent [sic] in my cell and took my blanked [sic] and
> sheets and I sleept [sic] in the cell for 3 days with out
> a blansked [sic] or a sheet's. [T]his was cruel and
> unusual punishment and so I was in violation of my civil
> Right as a U.S.A[.] citizen, in Shelby county Jail. This
> is why I suit [sic] the Defender's for five hundred
> thousand dollar[.]

(Affidavit of Gilberto Ruiz, sworn to on May 10, 2010 ("Ruiz Aff.")
(D.E. 28).) Thus, in his second version of events, Plaintiff has
apparently abandoned his claims that, after entering the recreation
cage, Defendant Davis punched him in the face, Defendant Atkins
punched him in the face and neck, and other DRT members kicked him.

Forty-two U.S.C. § 1983 provides a right of action
against state officials who violate a plaintiff's rights under the
U.S. Constitution or federal law. In analyzing a claim of excessive
force, it is first necessary to determine the source of Plaintiff's
right. As the Sixth Circuit Court of Appeals has explained:

> "In addressing an excessive force claim brought under §
> 1983, analysis begins by identifying the specific
> constitutional right allegedly infringed by the
> challenged application of force." Graham v. Connor, 490
> U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).
> "[T]he two primary sources of constitutional protection

against physically abusive governmental conduct" are the Fourth and Eighth Amendments. Id. The Fourth Amendment's prohibition against unreasonable seizures of the person applies to excessive-force claims that "arise[] in the context of an arrest or investigatory stop of a free citizen," id., while the Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences. See Whitley v. Albers, 475 U.S. 312, 318-322, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986). When neither the Fourth nor the Eighth Amendment serves to protect citizens, courts have applied the Fourteenth Amendment. Lanman v. Hinson, 529 F.3d 673, 680-81 (6th Cir. 2008).

. . . The standards of liability for these causes of action vary widely, see Darrah v. City of Oak Park, 255 F.3d 301, 306 (6th Cir. 2001) ("A substantially higher hurdle must be surpassed to make a showing of excessive force under the Fourteenth Amendment than under the 'objective reasonableness' test of [the Fourth Amendment] ....."), and which amendment applies depends on the status of the plaintiff at the time of the incident, whether free citizen, convicted prisoner, or something in between. See Gravely v. Madden, 142 F.3d 345, 348-49 (6th Cir. 1998).

. . . .

. . . [I]f a plaintiff is in a situation where his rights are not governed by either the Fourth or the Eighth Amendment, the Due Process Clause of the Fourteenth Amendment protects the individual against physical abuse by officials. Darrah, 255 F.3d at 305-06. Specifically, "[i]t is clear ... that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." Graham, 490 U.S. at 395 n. 10, 109 S. Ct. 1865. According to the Supreme Court, a pre-trial detainee is one who "has had only a 'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest.'" Bell v. Wolfish, 441 U.S. 520, 536, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) (citing Gerstein v. Pugh, 420 U.S. 103, 114, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975)).

Aldini v. Johnson, 609 F.3d 858, 864-65 (6th Cir. 2010). In this case, Plaintiff was a pretrial detainee at the Jail at the time of the events at issue. He had been indicted on a charge of aggravated

14

robbery on August 23, 2007,[5] and, therefore, the use of force in this case is analyzed under the Fourteenth Amendment. "The Due Process Clause of the Fourteenth Amendment extends the protecti[o]n of the Eighth Amendment to pretrial detainees." <u>Harrell v. Grainger County, Tenn.</u>, No. 09-6334, 2010 WL 3245767, at *3 (6th Cir. Aug. 17, 2010).[6] The use of excessive force by a prison guard against an inmate violates the Eighth Amendment. <u>Combs v. Wilkinson</u>, 315 F.3d 548, 556 (6th Cir. 2002). "[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Hudson v. McMillian</u>, 503 U.S. 1, 6-7 (1992); <u>see also</u> <u>id.</u> at 9 ("When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated."); <u>Griffin v. Hardrick</u>, 604 F.3d 949, 953 (6th Cir. 2010) ("The test for whether the use of force violates the Eighth Amendment requires a court to determine if the defendant's conduct caused the 'unnecessary and wanton infliction of pain.'") (quoting <u>Moore v. Holbrook</u>, 2 F.3d 697, 700 (6th Cir. 1993)).

---

[5]     This information is available from the website for the Shelby County Criminal Court. The indictment number is 07 06057.

[6]     In <u>Griffin v. Hardrick</u>, 604 F.3d 949, 953 (6th Cir. 2010), the Sixth Circuit noted that the protections of the Fourteenth Amendment are "potentially broader" than those of the Eighth Amendment but stated that it was appropriate to analyze the claims of a pretrial detainee under the Eighth Amendment where he has not argued that he is entitled to additional protection. In this case, Defendants' motion argues that Eighth Amendment standards should be applied to Plaintiff's claim (D.E. 24 at 11), and Plaintiff has not objected.

> [T]o ascertain whether excessive force was used under the
> Eighth Amendment, the court must determine whether the
> force was applied in a good-faith effort to maintain or
> restore discipline, or maliciously and sadistically to
> cause harm. Such a claim has both an objective and a
> subjective component. The objective component requires
> that the pain be serious. The subject component requires
> that the offending, non-penal conduct be wanton.

Griffin, 604 F.3d at 954 (quoting Watkins v. Evans, Nos. 95-4162,

95-4341, 1996 WL 4999094, at *2 (6th Cir. Sept. 3, 1996) (citations

omitted)). "Factors to consider in determining whether the use of

force was wanton and unnecessary include the extent of injury

suffered by an inmate, 'the need for application of force, the

relationship between that need and the amount of force used, the

threat "reasonably perceived by the responsible officials," and

"any efforts made to temper the severity of a forceful response."'"

Combs, 315 F.3d at 556-57 (quoting Hudson, 503 U.S. at 7).

The Sixth Circuit has also emphasized that the use of

force by corrections officers is entitled to deference:

> Turning now to whether Hardrick's use of force was
> excessive, this court has previously cautioned that an
> official's decision to use force is entitled to
> deference:
>
>> [O]fficials confronted with a prison disturbance
>> must balance the threat [that] unrest poses to
>> inmates, prison workers, administrators, and
>> visitors against the harm inmates may suffer if
>> guards use force. Because prison officials must
>> make their decisions in haste, under pressure, and
>> frequently without the luxury of a second chance,
>> we must grant them wide-ranging deference in the
>> adoption and execution of policies and practices
>> that in their judgment are needed to preserve
>> internal order and discipline and to maintain
>> institutional security.
>
> Combs v. Wilkinson, 315 F.3d 548, 557 (6th Cir. 2002)
> (first alteration in original) (citations and internal

> quotation marks omitted). The issue is therefore not whether the use of force was absolutely necessary in hindsight, but "whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." <u>Whitley</u>, 475 U.S. at 321, 106 S. Ct. 1078.

<u>Id.</u> at 954.

It is appropriate for a district court evaluating a motion for summary judgment on an excessive force claim to view a videotape of the events at issue.

> The Supreme Court, however, has held that a court may properly consider videotape evidence at the summary-judgment stage. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." <u>Scott v. Harris</u>, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (holding that, based on videotape evidence, a police officer did not use excessive force in ramming a fleeing suspect's car). Moreover, the reasonableness of a defendant's actions is an appropriate matter to determine on summary judgment. <u>Dunn v. Matatall</u>, 549 F.3d 348, 353 (6th Cir. 2008) (explaining that <u>Scott</u> "instructs us to determine as a matter of law whether the events depicted on [a] video, taken in the light most favorable to [the nonmoving party], show that the Officers' conduct was objectively reasonable"). The district court thus properly considered the videotape evidence in determining whether [the officer's] actions were wanton.

<u>Griffin</u>, 604 F.3d at 954.

As a preliminary matter, both Plaintiff's complaint and his affidavit allege that he was struck by Defendants Atkins and Davis. There are no allegations that Defendants Thomas, Stevenson, Brown, and Johnson assaulted Plaintiff, and each of these defendants has stated, under oath, that he or she did not assault Plaintiff. Defendant Johnson, who operated the video camera, denied

any physical contact with Plaintiff. In order to recover from the named defendants, Plaintiff must establish that each defendant used excessive force against him. <u>Combs</u>, 315 F.3d at 557-58.[7] Because no such evidence has been presented, the Court GRANTS the motions for summary judgment filed by Defendants Thomas, Stevenson, Brown, and Johnson. The complaint is DISMISSED as to those parties.

As for Plaintiff's claims against Defendants Davis and Atkins, Plaintiff does not dispute that he refused to leave the recreation cage after his request to use the telephone was denied. The DVD reflects that, before the full DRT team arrived, Defendant Davis verbally directed Plaintiff to leave the recreation cage and return to his cell, and he refused to do so. Defendant Davis was wearing a shirt with the words "Detention Response Team" on the back. At the conclusion of that segment, Defendant Davis stated that "we're going to let Lieutenant Richmond handle it."[8] It is also evident that Plaintiff knew that, if he refused to return to his cell, the DRT team would be called to extract him from the recreation cage. This is demonstrated by the facts that, when the full DRT team arrived, the video shows that Plaintiff had a red

---

[7]    In his verified complaint, Plaintiff alleged that, when they entered the recreation cage, DRT officers began kicking him all over his body. <u>See</u> <u>supra</u> p. 5. He also contends unnamed DRT officers kicked him in the elevator until he passed out. <u>Id.</u> These assertions are contradicted by the video of the incident. In his affidavit, which was submitted after a copy of the DVD was produced to him, Plaintiff did not repeat his claim that other DRT members kicked him while extracting him from the recreation cage. Even if it were assumed that some member of the DRT other than Davis and Atkins used excessive force, Plaintiff is responsible for identifying that person.

[8]    In his affidavit, Defendant Davis states that "[t]he Plaintiff refused to return to his cell and a supervisor was notified." (Davis Aff., ¶ 10.) Davis recounts that "[a] decision was made to have the DRT team remove the Plaintiff from the recreation area to return to his cell." (<u>Id.</u>, ¶ 11.)

cloth over his nose and mouth and was holding a cup containing a liquid.[9] Thus, Plaintiff's "undisputed conduct alone provided the [defendants] with a good faith basis for using force to control [Plaintiff], restore discipline and order, and transport him back to his cell." Lockett v. Suardini, 526 F.3d 866, 875 (6th Cir. 2008).[10]

Although the initial exchange between Plaintiff and Defendant Davis was calm, the situation had escalated when the team appeared.[11] Plaintiff had a red cloth over his face, in anticipation of the use of a chemical agent, and he was holding a cup of liquid and dancing about in his cell. It also appears that Plaintiff was howling. Plaintiff was ordered to turn around, and he did not comply. Plaintiff was sprayed with a chemical agent and, immediately thereafter, threw the liquid at the DRT team. One or more team members sprayed more of the chemical agent into the cage. During the approximately two (2) minutes that it took to unlock the door to the cage, the DVD reflects that Plaintiff was jumping up and down, lifting his shirt, and taunting the team.

---

[9]     Defendants contend the liquid was urine, and Plaintiff contends it was juice from his lunch. The Court must resolve all disputed factual issues in favor of Plaintiff and, therefore, will assume the substance was juice. The Court does not assume that Defendants knew the substance was juice.

[10]     In his complaint and affidavit, Plaintiff alleged that it was Defendant Atkins who had refused his request to use the telephone. See supra pp. 5, 12. The DVD makes clear that it was Defendant Davis who gave Plaintiff the verbal order to return to his cell and who disregarded his complaints about use of the telephone.

[11]     As the DRT team was assembling, Officer Atkins stated for the camera that Plaintiff had a cup of urine and was threatening to throw it on staff and that he was kicking on the door of the cage. These statements, which are not repeated in the Atkins Affidavit, will be disregarded.

To the extent Plaintiff challenges the use of the chemical agent, he has no claim. Courts have upheld the use by prison officials of chemical agents, such as pepper spray or mace, to control disruptive inmates. Davis v. Agosto, 89 F. App'x 523, 526 (6th Cir. 2004) (affirming summary judgment); Leonard v. Hoover, 76 F. App'x 55 (6th Cir. 2003) (affirming summary judgment); Combs, 315 F.3d at 557 ("the use of mace to control a prison inmate is not malicious or sadistic"); Siggers v. Renner, 37 F. App'x 138, 140 (6th Cir. 2002); Thomas v. Greene, No. 99-3179, 1999 WL 1253102, at *2 (6th Cir. Dec. 17, 1999). Plaintiff also does not claim he sustained any injuries from the chemical agent.

Plaintiff contends that Defendants Davis and Atkins used excessive force in extracting him from the recreation cage. The total amount of time the officers spent in the cage is approximately two minutes. The officers enter the cage at 04:59 on the DVD, and they stand up to leave to 06:44. Defendant Atkins, who is holding the shield, and another officer rush at Plaintiff, who is on the ground at 04:52, three seconds after entry. The specific actions taken by each officer after entry are unclear because the door to the recreation cage, and the backs of the officers, block much of the action. The other inmates in the area were shouting and banging on the doors of their cells, making it impossible to hear what the officers and Plaintiff are saying or doing. The officers are kneeling around Plaintiff on the ground and, therefore, the claim in the complaint that he was repeatedly kicked is plainly contradicted by the videotape. Plaintiff leaves the cell at 07:36.

By that time, his hands are cuffed behind his back, his legs (which cannot be seen) are shackled, and he is wearing a mask over his mouth, which is held in place by a piece of mesh that covers his entire head. Plaintiff is walking under his own power, and there is a spot of blood showing on the mask. In light of the brief time it took to perform the extraction and the fact that Plaintiff left the cell under his own power, no reasonable juror could conclude that Plaintiff lost consciousness during the cell extraction.

After leaving the recreation cage, Plaintiff is taken on an elevator to the medical unit, and he contends that Defendants Davis and Atkins used excessive force while he was on the elevator. The video shows Plaintiff and the officers approaching the elevator at 08:07, and they left the elevator at 09:01. It is difficult to tell from the tape what is happening in the elevator. More than one person in the elevator is breathing heavily, which drowns out the voices. It appears to be undisputed that Plaintiff was placed on his knees for the elevator ride. There appears to be a commotion from 08:42 through 08:57. Defendant Davis can be heard saying, "Stay down, stay down," and "Stop resisting, stop resisting." The elevator door is opened by 08:57, and Defendant Davis continues saying "Stop resisting" through 09:08. At 09:10, Plaintiff can be seen walking off the elevator under his own power. The spot of blood on Plaintiff's mask is larger than when he left the recreation cage, and there might be a smear of blood on his white t-shirt. There is no indication, either visual or auditory, that Plaintiff is being repeatedly kicked, and there does not appear to

21

have been enough room in the crowded elevator for that to have occurred. Plaintiff cannot be heard begging anyone to stop. In light of the brief time spent in the elevator, and the fact that Plaintiff walked out under his own power, no reasonable juror could conclude that Plaintiff lost consciousness.

At the medical department, Plaintiff is placed in an examination room. He is shown sitting on an examination table without support. He can be heard speaking to the officers, but his mouth is partially covered by the mask and his words are not distinct.[12] A nurse enters the examination room, and Plaintiff can be heard providing her with his identifying information.[13] The nurse asked what happened, and an officer related that Plaintiff had been extracted from a recreation cage. At 13:50, Plaintiff can be heard telling the nurse that he sustained an injury to his tongue when he bit down on it. He said, "I don't know if I ripped a piece of my tongue. I know something hanging in there." Plaintiff then continues speaking to the officer in front of him, but his words are indistinct. One officer tells Plaintiff that they are probably going to put something in the back, and Plaintiff responds, "Throw it away. It don't matter. Do that." At 15:10, the nurse leaves the examination room without having looked at Plaintiff's mouth, saying that she is going to make a copy. Plaintiff continues to talk to

---

[12]     Defendants say Plaintiff continued to threaten the officers, but it is not possible to confirm that from the tape.

[13]     In his complaint, Plaintiff says the nurse's name is Pittman, and in his affidavit he says it is Goodman. Neither party has submitted Plaintiff's medical records or an affidavit by the nurse, so the discrepancy is not material.

the officer, and he appears to be alert and animated. At 16:56, the nurse gives the officer a piece of paper, and Plaintiff and the officers leave the medical unit at 17:17. The officers enter the elevator, where Plaintiff is again placed on his knees. Plaintiff is returned to his cell.

Defendants Davis and Atkins are entitled to summary judgment on the excessive force claim arising from the extraction of Plaintiff from the recreation cage. As previously discussed, see supra pp. 18-19, 20-21, the need for physical force to extract Plaintiff from the cage was clear. Plaintiff had refused to leave the cage, he had prepared for a physical altercation with the DRT team, he was not subdued by the chemical spray and, instead, escalated the situation by throwing the liquid and by jumping up and down and taunting the team. In response to the confrontation, other inmates in the cell block can be heard shouting and beating on the doors of their cells. (Davis Aff., ¶ 12(C).) There is no evidence that officers used more force than was necessary to subdue Plaintiff, handcuff and shackle him, and place a mask over his face. Plaintiff apparently bit his tongue during this encounter, because there is blood on his mask when he was escorted out of the cage. Neither the complaint nor the affidavit attribute this injury to any particular wrongful action by any defendant. Plaintiff also does not claim that he suffered any lasting effects of the injury to his tongue, and he does not claim that he suffered any physical injury other than to his tongue. Even if it is assumed that the pain inflicted was serious, it plainly appears that the actions of

Defendants Davis and Atkins during the cell extraction were not wanton and were, instead, taken in a good faith attempt to restore discipline. Therefore, the Court GRANTS summary judgment to Defendants Davis and Atkins on Plaintiff's claims concerning the cell extraction.

Plaintiff's claims concerning the elevator ride must be separately analyzed because Defendants had gotten Plaintiff under control by the time he left the recreation cage. Plaintiff contends that, while on the elevator, Defendant Atkins struck him and Defendant Davis choked him. Defendants' affidavits do not address any use of force on the elevator, and the DVD is inconclusive. Although it appears, as previously discussed, see supra pp. 21-22, that Plaintiff's description of the alleged assault on the elevator ride is exaggerated, the Court is unable to conclude, as a matter of law, that Plaintiff has not raised a triable issue about whether Defendants Davis and Atkins used excessive force during the elevator ride to the medical unit. The Court DENIES the motion for summary judgment filed by Defendant's Davis and Atkins on that basis.

Defendants also have moved for summary judgment on the basis of qualified immunity. (D.E. 24 at 13-14.) "Governmental officials performing discretionary functions generally are shielded from liability for civil damages in so far as their conduct does not violate clearly-established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

> A court required to rule upon the qualified immunity
> issue must consider . . . this threshold question: Taken
> in the light most favorable to the party asserting the
> injury, do the alleged facts show the officer's conduct
> violated a constitutional right? This must be the initial
> inquiry. . . .
>
> If no constitutional right would have been violated
> were the allegations established, there is no necessity
> for further inquiries concerning qualified immunity. On
> the other hand, if a violation could be made out on a
> favorable view of the parties' submissions, the next,
> sequential step is to ask whether the right was clearly
> established. This inquiry, it is vital to note, must be
> undertaken in the specific context of the case, not as a
> broad general proposition.

Saucier v. Katz, 533 U.S. 194, 201 (2001) (citation omitted).

"Qualified immunity shields an officer from suit when she makes a

decision that, even if constitutionally deficient, reasonably

misapprehends the law governing the circumstances she confronted."

Brousseau v. Haugen, 543 U.S. 194, 198 (2004); see also Dunigan v.

Noble, 390 F.3d 486, 491 (6th Cir. 2004) ("In other words, where a

constitutional violation exists, an officer's personal liability

turns on the 'objective legal reasonableness' of the action in view

of the circumstances the officer confronted assessed in light of

'clearly established' legal rules.") (citing Saucier, 533 U.S. at

201).

Defendants' argument on qualified immunity is identical

to their argument on the merits: they contend that no

constitutional violation occurred. (D.E. 24 at 13-14.) Because

Plaintiff has failed to raise a triable issue of fact in support of

his claims against Defendants Thomas, Stevenson, Brown, and

Johnson, the Court GRANTS their motion for summary judgment on the

basis of qualified immunity. The Court also GRANTS the motion of Defendants Davis and Atkins for summary judgment on the basis of qualified immunity on Plaintiff's claims about his extraction from the recreation cage. The motion of Defendants Davis and Atkins for summary judgment on the basis of qualified immunity on Plaintiff's claims concerning the elevator ride are DENIED.

IT IS SO ORDERED this 7th day of September, 2010.


**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE